**In the United States District Court
for the District of Kansas**

_____

Case No. 25-cv-2130-TC

_____

ALICIA LOCKETT,

*Plaintiff*

v.

USIC LOCATING SERVICES, LLC,

*Defendant*

_____

**MEMORANDUM AND ORDER**

Alicia Lockett sued USIC Locating Services, LLC, for employment discrimination. Doc. 45. USIC requests summary judgment. Doc. 49. For the following reasons, that motion is granted in part and denied in part.

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency that Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

1

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

**B**

This is an employment discrimination case. Defendant USIC hired Plaintiff Alicia Lockett in October 2021 and terminated her in July 2024. Doc. 45 at ¶¶ 2.a.i, 2.a.v, 2.a.xii.[1] In this lawsuit, Lockett contends that USIC subjected her to a hostile work environment and terminated her because she engaged in protected activities. *Id.* at ¶ 4.a.

Kansas law requires individuals to notify Kansas811 before they dig in a particular area. Doc. 50 at ¶¶ 2. When an individual submits a request to Kansas811, third-party locating companies like USIC receive a "ticket" to inspect the area for underground utility lines. *Id.* at ¶¶ 1, 3. USIC hires locators to perform this work. *Id.* at ¶ 5.

USIC hired Lockett to work as a locator. Doc. 45 at ¶ 2.a.v. Her job was to respond to citizen requests, placed via the Kansas811 system, by inspecting and determining whether the presence of underground utilities made it unsafe to dig in a particular area. Doc. 50 at

---

[1] All document citations are to the document and page number assigned in the CM/ECF system. All facts are uncontroverted unless otherwise specified.

¶¶ 3, 4, 6. She had a company-issued vehicle and would drive directly from her home to the location of her assignments. Doc. 51 at 5 ¶ 17.

Lockett's claims revolve around the conduct of three men, Steve Schroeter, Bob Rafols, and Billy Lyons. An explanation of her interactions with these men will help contextualize the dispute.

Steve Schroeter was Lockett's trainer when she started at USIC. Doc. 50 at ¶ 20; Doc. 51 at 12 ¶ 54. Lockett alleges that Schroeter behaved inappropriately toward her in several ways. For example, Schroeter would "hit[ ] on [Lockett] every day all day." Doc. 50-4 at 52; Doc. 51 at 12 ¶ 54. He told Lockett that he had a black wife, girlfriend, and kids, that he loved black women, that Lockett looked like his wife, and that he would hit on Lockett if he were younger.[2] Doc. 51 at 12 ¶ 55. In one instance, Schroeter gifted Lockett a ring, and a dispute arose when he asked for the ring back a week later but Lockett had sold it. Doc. 50 at ¶¶ 21–23. In another instance, Lockett was asleep at work in her truck. Doc. 51 at 12 ¶ 57. Schroeter woke Lockett and told her that a contractor had seen her asleep and asked Schroeter if he usually let his employees sleep on the clock. *Id.*; Doc. 51-4 at 11. Schroeter told Lockett that he had replied to the contractor that he (Schroeter) had slept with Lockett the previous night, and that was the reason why he let her sleep at work. Doc. 51 at 12 ¶ 57; Doc. 51-4 at 11. USIC denies that Schroeter behaved inappropriately toward Lockett. Doc. 53 at ¶¶ 54–57.

Lockett went on maternity leave in November 2022. Doc. 45 at ¶ 2.a.vii. While on leave, she complained to her office supervisor, Phil Shaver, that Schroeter had driven past her house. Doc. 50 at ¶¶ 24. Shaver looked at the GPS data of Schroeter's company vehicle and found no evidence that Schroeter had driven past Lockett's house. *Id.* at ¶ 25. Nevertheless, he insisted that Schroeter have no more contact with Lockett. *Id.* at ¶ 26. After this incident, which occurred in late 2022, Lockett had no further contact with Schroeter. *Id.* at ¶ 27.

USIC assigned Bob Rafols to be Lockett's supervisor when she returned to work in January 2023. Doc. 50 at ¶ 33. Lockett contends that Rafols also behaved inappropriately. For example, Rafols often talked about his sex life, describing how he had tied a woman to a pool table during sex, how he had slept with two coworkers, and how he

---

[2] Lockett is a black woman. Doc. 51 at ¶ 55.

had slept with a woman he met at a truck stop. Doc. 51 at 13 ¶¶ 63, 64, 16 ¶¶ 76, 78. On one occasion, he told three employees that he was going to purchase a sex doll and asked a coworker if he believed Lockett had an OnlyFans account. *Id.* at 13 ¶ 64, 15 ¶ 74. Lockett testified in her deposition that she missed lunch and office meetings because she did not want to hear these stories. *Id.* at 16 ¶¶ 78, 79; Doc. 51-4 at 14. Rafols denied that he made inappropriate comments. Doc. 53 at ¶¶ 76, 78.

Lockett met Billy Lyons around November 2023. Doc. 50 at ¶ 30; Doc. 50-4 at 51. Lyons was USIC's office supervisor. Doc. 51 at 4 ¶ 15. Lockett contends that Lyons behaved inappropriately three times. First, in "late 2023," Lyons questioned how someone with Lockett's fingernails and eyelashes could work as a locator. Doc. 45 at 7; Doc. 51 at 14 ¶ 66. Lyons denies making that comment. Doc. 53 at ¶ 66. Second, in February or March 2024, someone at work took a photo of Lockett and circulated it among the office. Doc. 45 at 7; Doc. 51 at 14 ¶ 68. Lyons told Lockett that he knew what she was wearing because he had seen the photo. Doc. 51 at 14 ¶ 68. Lyons also denies that this happened. Doc. 53 at ¶ 68. Finally, at an unspecified time, Lyons said he did not want Lockett working at USIC because he feared she would file a sexual harassment lawsuit. Doc. 51 at 14 ¶ 69. Lyons denies having said so. Doc. 53 at ¶ 69.

By November 2023, Lockett had developed a habit of tardiness and absenteeism. Doc. 50 at ¶ 34. When Lyons became her office supervisor around that time, he told Lockett that she had to improve her attendance. *Id.* at ¶¶ 30, 40. The parties dispute whether tardiness and absenteeism were common and accepted at USIC. Lockett argues that USIC accepted her poor attendance and that many others at USIC were often late and absent. Doc. 51 at 19 ¶ 34, 20 ¶ 37. USIC disagrees. Doc. 50 at ¶¶ 37, 65. But there is no dispute that Lockett's attendance was poor and that Lyons asked her to improve it. Doc. 50 at ¶¶ 30, 34, 40.

Lockett's attendance did not improve after Lyons spoke to her in November 2023. Doc. 50 at ¶ 42. Lockett left work early on January 18, 2024, missed work on January 19, and was late on April 22 and 25. *Id.* at ¶¶ 42–45. On May 1, Lockett told USIC that she would miss work because she was in the hospital. *Id.* at ¶ 46. This was a lie: Lockett was not in the hospital but, rather, was working a second job at a

4

company called Zum.[3] *Id.* at ¶ 47; Doc. 45 at ¶ 2.a.ix. And on June 10, Lockett texted her supervisor that she would be late because her aunt had died the day before. Doc. 50 at ¶ 55. This, too, was a lie: Lockett's aunt had not died.[4] *Id.* ¶ 59; Doc. 45 at ¶ 2.a.x. Lockett requested bereavement leave on account of her aunt, but USIC denied her request. Doc. 50 at ¶¶ 56–58. Lockett took leave anyway and used the time off to work shifts at Zum. *Id.* Lockett subsequently missed work on July 11 and July 19. *Id.* at ¶¶ 61, 63.

On May 14, 2024, Lockett contacted USIC's human resources department to report various incidents. Doc. 50 at ¶ 51. She complained that Schroeter had harassed her in 2022 and that Rafols had made inappropriate comments in September 2023. Doc. 51 at ¶¶ 51, 52.

USIC terminated Lockett on July 22, 2024. Doc. 50 at ¶ 64. Lockett then filed suit in federal court. Doc. 45. Four counts remain. In Counts I and II she argues that USIC subjected her to a hostile work environment in violation of Title VII, 42 U.S.C. § 2000e-2.[5] *Id.* at ¶ 4.a.i. In Count III, she argues that USIC retaliated against her by firing her because she reported sexual harassment in the workplace, also in violation of Title VII. *Id.* at ¶ 4.a.ii. And in Count IV, she argues that USIC retaliated against her by firing her because she filed a worker's compensation claim, in violation of K.S.A. § 44-501. *Id.* at ¶ 4.a.iii.

---

[3] Lockett is currently involved in a lawsuit against Zum where she makes similar claims to the ones she makes here against USIC. *Compare Lockett v. Zum Servs., Inc.*, No. 25-cv-571 (W.D. Mo. Jul. 23, 2025), Doc. 1-1 at 4–6 (making claims of sexual harassment and retaliation), *with* Doc. 45 at ¶ 4.a (same).

[4] USIC learned during this litigation that Lockett lied about being in the hospital, lied about her aunt dying, and had a second job. Doc. 50 at ¶ 60. Those are all behaviors that would have warranted termination and, as a result, USIC seeks to limit its damages vis-à-vis Counts III and IV. *Id.* at 29–30. As explained below, Counts III and IV fail as a matter of law, so USIC's request is denied as moot.

[5] It appears that Count I and Count II are indistinguishable. Lockett labels both as "sexual harassment/hostile work environment," Doc. 45 at ¶ 4.a.i, and the Pretrial Order does not explain how each Count is different. *See id.* USIC makes no argument that either Count should be dismissed as duplicative. As a result, this Memorandum and Order treats them as coextensive.

USIC requests summary judgment on all claims. Doc. 49. It argues that Lockett's hostile work environment claims are time barred and, in any event, fail on the merits. Doc. 50 at 15. And it argues that Lockett's retaliation claims fail because it had a legitimate and non-discriminatory reason for terminating her. *Id.* at 24.

## II

USIC seeks summary judgment on all claims. That request is denied with respect to the hostile work environment claims because there exist genuine disputes of material fact and as to the possibility of punitive damages for those claims given the lack of clarity in the parties' legal and factual contentions. But with respect to the retaliation claims, USIC offers a legitimate reason for terminating Lockett, and Lockett lacks any evidence of pretext. Accordingly, USIC's motion is granted in part as to Counts III and IV and denied in part as to Counts I and II.

## A

Lockett argues in Counts I and II that USIC subjected her to a hostile work environment in violation of Title VII, 42 U.S.C. § 2000e-2. Doc. 45 at ¶ 4.a.i. "A hostile work environment claim is 'composed of a series of separate acts that collectively constitute one unlawful employment practice.'" *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021) (quoting *Nat. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)). To survive summary judgment, the plaintiff must show that she faced discrimination because of her sex and that the discrimination was "sufficiently severe or pervasive" such that it altered the terms of conditions of her employment. *Id.*

USIC requests summary judgment on Counts I and II based on two separate arguments. First, it argues that Lockett's allegations vis-à-vis Schroeter and Rafols's conduct are time barred. Second, it argues that her claim fails on the merits.

## 1

USIC requests summary judgment on Counts I and II, arguing that Lockett's allegations concerning Schroeter and Rafols are time barred. Doc. 50 at 15. A plaintiff pursuing Title VII claims must file a charge of discrimination with the Equal Employment Opportunity Commission within 300 days of the alleged discriminatory conduct. *Ford v.*

*Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1227 (10th Cir. 2022); *see* 42 U.S.C. § 2000e-5(e)(1).

This requirement works simply when there is a discrete act but is difficult to apply in claims of a hostile work environment. The reason is because "these claims 'often involve a series of incidents that span a period longer than 300 days.'" *Ford*, 45 F.4th at 1228 (quoting *Duncan v. Manager, Dep't of Safety, City and Cnty. of Denver*, 397 F.3d 1300, 1308 (10th Cir. 2005)). After all, the concept of a hostile work environment is that there is no singular event, but rather the culmination of several events that, over time, have the cumulative effect of changing the terms and conditions of employment much like a termination would. See *Nat'l R.R.*, 536 U.S. at 117. As a result, "'it does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period.'" *Ford*, 45 F.4th at 1228. (quoting *Nat. R.R.*, 536 U.S. at 117).

When applying the 300-day time limit to hostile work environment claims, the focus is on whether there is an act "contributing to the claim that occurs within the filing period." *Ford*, 45 F.4th at 1228–29. If there is, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability as long as the acts about which an employee complains are part of the same actionable hostile work environment practice." *Id.* at 1229. The Tenth Circuit has identified various non-exhaustive factors that affect whether an event is part of the same claim of a hostile work environment, such as whether the pre- and post-limitations incidents "involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id.* (brackets omitted).

Because Lockett filed a charge of discrimination on August 20, 2024, any acts occurring before October 25, 2023, are presumptively barred. *See* Doc. 1-1. Schroeter's conduct occurred in late 2022 and Rafols's in September 2023 and before. Doc. 50 at ¶ 27; Doc. 50-4 at 74, 78–79. Lyons's conduct, however, occurred within the statutory time period. Doc. 50 at ¶ 30. As a result, Lockett contends all are actionable because they are related and contributed to her claim of hostile work environment harassment and discrimination. Doc. 51 at 28.

Disputed issues of fact preclude finding that Lockett's allegations regarding Schroeter and Rafols are time barred. *Contra* Doc. 50 at 15. That is because a jury could find that Lyons's conduct, which falls

within the statutory time period, was sufficiently related to Schroeter's and Rafols's so as to constitute the same actionable hostile work environment. *See Ford*, 45 F.4th at 1229 (reversing grant of summary judgment because "at the very least, [plaintiff] has demonstrated a triable issue as to whether [an incident] constituted the same actionable hostile work environment practice") (ellipsis and quotation marks omitted). In particular, Lyons commented on Lockett's feminine aesthetics—eyelashes and nails—and questioned how someone who looked like her could work as a locator. Doc. 51 at 14 ¶ 66. Moreover, the facts viewed in the light most favorable to Lockett suggest that Lyons said he did not want Lockett to work at USIC because he feared she would file a sexual harassment lawsuit. *Id.* at 14 ¶ 69.

These comments, if believed, are sufficiently related to Schroeter's and Rafols's conduct in type. All comprised gendered comments and behavior that one would not typically express about a man. They are also related by perpetrator and location: Schroeter, Rafols, and Lyons were all Lockett's supervisors and the behavior occurred at work. *See Ford*, 45 F.4th at 1229 (finding that various incidents of "sex-based hostility" were related even though one incident involved an individual who was "not the same manager" as that involved in other incidents). Drawing all the inferences in the light most favorable to Lockett, a reasonable jury could conclude that Lyons's conduct constituted part of the same actionable claim of a hostile work environment.

USIC's counterarguments are unpersuasive. It argues that, if accepted, Lockett's position would mean that "no hostile work environment allegation could ever be untimely as long as a plaintiff made one timely allegation, however attenuated it may be." Doc. 53 at 9 (emphasis omitted). But as noted above, Lyons's conduct—when viewed in the light most favorable to Lockett—was not as attenuated to Schroeter's and Rafols's as USIC would make it. Rather, a reasonable jury could find that Lyons's conduct formed part of the same actionable hostile work environment practice given its similarity to Schroeter's and Rafols's conduct in type (feminine sexuality), perpetrator (her supervisor), and location (at work). That is enough to create a triable issue. *See Ford*, 45 F.4th at 1229 (reversing summary judgment where there was a triable issue regarding timeliness).

## 2

Even assuming Lockett's claims are not time-barred, USIC argues that Lockett's hostile work environment claims fail on the merits

because she has not shown that the alleged conduct was severe or pervasive. Doc. 50 at 20. Title VII "does not establish a general civility code for the workplace and [ ] a plaintiff may not predicate a hostile work environment claim on the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015). As such, a plaintiff must "present evidence that creates a genuine dispute of material fact as to whether the workplace is permeated with discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id.* Pervasiveness and severity are independent and equal grounds to support a claim of a hostile work environment. *Id.* The inquiry is "particularly unsuited for summary judgment because it is inherently fact-found by nature." *Id.* (quotation marks omitted).

There exists a dispute of fact as to pervasiveness. *Contra* Doc. 50 at 21. That is enough to proceed to trial. *See Ford*, 45 F.4th at 1230–31. The evidence is sufficient such that a jury should have "the opportunity to evaluate the evidence, demeanor, and candor of witnesses and make the ultimate determination." *Lounds*, 812 F.3d at 1227. Schroeter, who was Lockett's first supervisor, started behaving inappropriately toward her as soon as she started working at USIC. Doc. 51 at 12 ¶ 54. Schroeter hit on Lockett "every day," and admitted to Lockett that he had told a contractor that he let the then-pregnant Lockett sleep at work because he had "fucked her good last night." Doc. 51-4 at 11; Doc. 51 at 12 ¶ 57. Rafols's conduct started once Lockett returned from maternity leave in January 2023. Rafols persistently made sexual comments and asked whether Lockett had an OnlyFans account. Doc. 51 at 13 ¶ 64, 15 ¶ 74. There is evidence, if believed by a jury, suggesting that these comments caused Lockett to stop attending lunch and office meetings. *Id.* at 16 ¶¶ 78, 79; *see Sharpe-Miller v. Walmart, Inc.*, __ F.4th __, No. 24-2055, 2026 WL 2015375, at *13 (10th Cir. July 13, 2026) (reversing summary judgment and noting that "[i]nterference with work performance can be a relevant factor in assessing whether conduct qualifies as a hostile work environment"). Finally, once Lockett met Lyons in November 2023, Lyons questioned how someone with Lockett's eyelashes and nails could work as a locator and commented that he did not want her to work in the office for fear that she would file a sexual harassment lawsuit. Doc. 51 at 14 ¶¶ 66–69. Considering the "longstanding view that a hostile work environment claim is particularly unsuited for summary judgment disposition," there is a genuine dispute of material fact as to whether the work environment at

9

USIC was permeated with conduct that was sufficiently pervasive to alter the terms and conditions of Lockett's employment. *Lounds*, 812 F.3d at 1232 (reversing summary judgment where the district court failed to perceive a genuine dispute regarding pervasiveness).

USIC's counterarguments fail. It argues that the conduct at issue was not pervasive because it was only a few "one-off events." Doc. 50 at 23. But the Tenth Circuit has "underscored that the word 'pervasive' is not simply a counting measure and requires a broader contextual analysis that carefully considers each instance as a component of the overall workplace milieu." *Lounds*, 812 F.3d at 1223. "Much like 'a play cannot be understood on the basis of some of its scenes but only on its entire performance,' which is the sum total of those scenes, 'a discrimination analysis must concentrate not on individual incidents, but on the overall scenario,' which is informed by the sum total of those incidents." *Id.* at 1223–24 (quoting *Penry v. Fed. Home Loan Bank of Topeka,* 155 F.3d 1257, 1262 (10th Cir. 1998)).

The "dispositive question" is whether there is sufficient evidence of pervasiveness such that the jury—not an unelected federal judge— should make the call. *Lounds*, 812 F.3d at 1227. Schroeter's behavior occurred daily and lasted for the entirety of his tenure as Lockett's supervisor. Doc. 51 at 12 ¶ 57. And Rafols's behavior began as soon as he became Lockett's supervisor, and it occurred so frequently that it created an environment that caused Lockett to miss meetings. *Id.* at 16 ¶¶ 78, 79. Considering the record in the light most favorable to Lockett, a jury could find that Lockett faced pervasive discrimination that altered the conditions of her employment. *See Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (reversing grant of summary judgment and noting that "what is important in a hostile environment claim is the *environment*") (emphasis in original).

### B

Lockett argues in Counts III and IV that USIC retaliated against her by terminating her, in violation of Title VII, 42 U.S.C. § 2000e-3, and Kansas law, K.S.A. § 44-501. Doc. 45 at ¶¶ 4.a.ii, 4.a.iii. Where, as here, there is no direct evidence of retaliation, both claims are analyzed on summary judgment pursuant to the *McDonnell Douglas* framework. *Byrnes v. St. Catherine Hosp.*, 158 F.4th 1107, 1113 (10th Cir. 2025); *White v. Tomasic*, 69 P.3d 208, 211 (Kan. Ct. App. 2003). The plaintiff must first make out a prima facie case of retaliation. *Byrnes*, 158 F.4th at 1113–14. If she does so, the burden shifts to the employer to offer a

legitimate reason for its decision. *Id.* If the employer meets its burden, the burden then returns to the plaintiff to show that the employer's reason is pretextual. *Id.*

Although USIC challenges Lockett's evidence at the prima facie stage, this Memorandum and Order assumes, without deciding, that Lockett could meet the necessary elements. That shifts the burden to USIC to offer a legitimate reason for its decision. *Byrnes*, 158 F.4th at 1113–14. The burden to establish a legitimate, nondiscriminatory reason is "exceedingly light." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017).

USIC has met that burden. It asserts that it terminated Lockett because of her absenteeism. Doc. 50 at 28. There is ample evidence to suggest that Lockett had poor attendance while she worked at USIC. *See id.* at ¶¶ 34, 40, 42–47. And absenteeism is a legitimate reason for an adverse employment decision. *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020). Lockett makes no argument to the contrary. *See* Doc. 51 at 31–39.

Once an employer satisfies its obligation to identify a lawful reason for the adverse employment decision, the burden returns to the employee to show that the reason was pretext for discrimination. *Byrnes*, F.4th at 1114. A plaintiff "may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1193 (10th Cir. 2018) (quoting *DePaula*, 859 F.3d at 970). In other words, a plaintiff may show that the defendant's reason is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude [it is] unworthy of belief." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1039 (10th Cir. 2011); *see also Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019).

Pretext probes the true intentions of the defendant, so the focus is limited to "whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007). A court's role "is to prevent intentional discriminatory . . . practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Dewitt v. S.W. Bell Tel. Co.*, 845 F.3d 1299, 1312 (10th Cir. 2017) (quoting *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006)). All facts are examined "as they appear *to the person making the decision*, not as they appear to the plaintiff." *Debord v. Mercy*

11

*Health Sys. of Kan., Inc.*, 737 F.3d 642, 655 (10th Cir. 2013) (citation and internal quotations omitted) (emphasis in original). Any doubts concerning pretext are resolved in the plaintiff's favor, but conjecture and bare allegations are not enough to show pretext. *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007).

Lockett makes three arguments in favor of pretext. Doc. 51 at 33. All fail.

*First*, Lockett argues that there were "procedural irregularities" with how USIC enforced its attendance policy against her. Doc. 51 at 33. Specifically, Lockett argues that USIC tolerated others' attendance issues and that it made "no serious effort" to enforce the attendance policy against her or anyone else. *Id.*

That argument finds no support in the record. *Contra* Doc. 51 at 33. The opposite is true: It is undisputed that USIC disciplined several employees for attendance violations, including Lockett. Doc. 50-10. Lockett has produced no evidence that USIC tolerated the absenteeism of employees who were similarly situated to her. Moreover, the evidence establishes that USIC tried to enforce its attendance policy against Lockett before terminating her. *Contra* Doc. 51 at 33. In particular, Lyons asked Lockett to improve her attendance when he became her supervisor. Doc. 50 at ¶ 30. Despite that counseling, there is no dispute that Lockett's attendance did not improve—in fact, it worsened. *See, e.g.*, *id.* at ¶ 42, 44–47. There is, quite simply, no evidence of procedural irregularities that would cast doubt on USIC's basis for termination. *Kincaid v. Unified Sch. Dist. No. 500, Kansas City, Kansas*, 94 F.4th 936, 949 (10th Cir. 2024) (affirming summary judgment where procedural irregularity did not show that the reason for the termination was insincere).

*Second*, Lockett argues that USIC tolerated others' misconduct. Doc. 51 at 34. Specifically, she argues that Schroeter and Rafols engaged in various misconduct at work and that USIC tolerated it. *Id.* This argument also fails. It is true that "[o]ne method by which a plaintiff can demonstrate an inference of discrimination is to show that the employer treated similarly situated employees more favorably." *Iweha v. State of Kansas*, 121 F.4th 1208, 1232 (10th Cir. 2024). But for individuals to be considered "similarly situated," they must deal with the same supervisor, be subject to the same standards governing performance evaluation and discipline, and have engaged in conduct of

12

comparable seriousness. *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1141 (10th Cir. 2024).

Lockett makes no argument, and lacks any evidence suggesting, that she was similarly situated to Schroeter and Rafols. To the contrary, the record shows that they were *not* similarly situated: Schroeter was Lockett's trainer and Rafols was her supervisor. Doc. 50 at ¶ 20, 33. Lockett cannot compare her conduct to her supervisors' because "[e]mployees are similarly situated when they *share a supervisor . . . .*" *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021) (emphasis added); *see Sousa v. Chipotle Servs., LLC*, 167 F.4th 1286, 1302 (10th Cir. 2026) (affirming summary judgment where the plaintiff did not show "that he was treated differently than similarly situated employees who were known by his supervisor to have violated work rules of comparable seriousness") (quotation marks omitted); *Riggs*, 497 F.3d at 1121 (same).

*Third*, Lockett asserts that there is "sufficient evidence to link her termination to her worker's compensation claim." Doc. 51 at 36. She points to an email between Lyons and Rafols in which Rafols emailed Lyons noting that Lockett had informed him that she had to get an epidural, and he wondered if someone could get an epidural when not "on light duty." Doc. 51-23 at 2. Lockett asserts that the email is "enough to connect the dots" Doc. 51 at 36, but fails to identify what those dots might be or explain what connection there is to her termination. Even construing the email charitably, and making all the inferences in favor of Lockett, the email does not call into question "whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs*, 497 F.3d at 1119. Nothing in the email evinces, and Lockett makes no argument suggesting, that USIC's reasons for terminating her had anything to do with her worker's compensation claim.

## C

A final issue—the possibility of punitive damages—remains. USIC requests summary judgment on Lockett's claims of punitive damages, arguing that it is entitled to the *Kolstad* defense. Doc. 50 at 31 (invoking *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999)). In particular, USIC argues that it maintained anti-discrimination policies and that it made a good faith effort to enforce those policies. *Id.*

13

Title VII provides that a plaintiff may recover punitive damages if the employer acted "with malice or with reckless indifference to the federally protected rights of [the plaintiff]." 42 U.S.C. § 1981a(b)(1). To justify such an award, the Supreme Court has held that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad*, 527 U.S. at 536. The Court noted that "[w]here an employer has undertaken [ ] good faith efforts at Title VII compliance, it demonstrates that it never acted in reckless disregard of federally protected rights." *Id.* at 544 (alterations and quotation marks omitted). Thus, "[t]o avail itself of *Kolstad*'s good-faith-compliance standard, an employer must at least 1) 'adopt antidiscrimination policies;' 2) 'make a good faith effort to educate its employees about these policies and the statutory prohibitions;' and 3) make 'good faith efforts to enforce an antidiscrimination policy.'" *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1138 (10th Cir. 2006) (quoting *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir. 2000)).

The parties briefs dispute whether *Kolstad* applies to Lockett's claims. That is because *Kolstad* "does not apply" in cases that are "premised on a theory of direct liability." *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1271 (10th Cir. 2000). A claim of direct liability is "a claim that the supervisor failed adequately to remedy the harassment. In such a case, the supervisor acts on behalf of the company in enforcing (or failing to enforce) its sexual harassment policy, and it is therefore fair to attribute his knowledge and acts to the company." *Cooke v. Stefani Mgmt. Servs., Inc.*, 250 F.3d 564, 569 (7th Cir. 2001) (citation omitted); *see McInnis*, 458 F.3d at 1138 n.4 ("Direct liability, unlike vicarious liability, is premised on a party's own malfeasance."). "In a vicarious liability case . . . the supervisor directly perpetrated the harassment through a series of rogue acts motivated by a desire to amuse himself, not benefit his employer." *Cooke*, 250 F.3d at 569.

Given the state of the summary judgment record, it is not clear what the parties' respective positions are. Lockett asserts that her claims include a theory of direct liability, thereby nullifying USIC's *Kolstad* defense. Doc. 51 at 37. But she does not identify the legal standard governing whether the hostile work environment claims are direct or vicarious, much less engage with that standard. *Id.* And that issue subsumes a variety of quite difficult issues that implicate facts the parties' briefs do not explore. *See, e.g.*, *McInnis*, 458 F.3d at 1138 n.4

14

(explaining that a direct liability claim requires resolving "what level of employment is equivalent to management-level," and that Tenth Circuit caselaw has "inconsistently define[d] which employees are sufficiently highly ranked to hold an employer directly liable at all"); *see also* Doc. 50 at 31 (claiming generally that *Kolstad* applies without engaging with either the legal standard or facts in the record); Doc. 51 at 37–38 (claiming generally that *Kolstad* does not apply without engaging with either the legal standard or facts in the record); Doc. 53 (failing to reply to *Kolstad* argument). Given this state of affairs, the best course of action is to deny the motion without prejudice and address it at a later time upon a more complete presentation by the parties. *See McInnis*, 458 F.3d at 1138 n.4 (declining to consider an issue that was not adequately briefed).

## III

For the foregoing reasons, USIC's Motion for Summary Judgment, Doc. 49, is GRANTED in part and DENIED in part.

It is so ordered.

Date: July 29, 2026                     s/ Toby Crouse
                                        Toby Crouse
                                        United States District Judge

15